of Plaquemines Holdings, and Mr. Lee, you look like you're ready. I am, Your Honor. May it please the Court, my name is Andrew Lee. I represent CHS, the owner and operator of a grain elevator and barge and ship dock operation on the Mississippi River about 20 miles south of here. This case is about the interpretation of a Louisiana servitude agreement. It is an agreement and a servitude that burdens my client CHS's property and river frontage down in Plaquemines Parish. By law, a servitude agreement must be construed in favor of CHS, the burdened, servient estate holder. That's a topic I'll get into in a moment. But the issue here is really not necessarily about CHS and Plaquemines Holdings, but there's a third party involved, and that third party is called Omega Refining. And the issue really boils down to whether Omega Refining is a lessee that has any right to use the servitude to construct a dock for its own use and purposes. This is the linchpin issue. Everything else falls away if that interpretation of the servitude agreement goes to CHS's direction. The remaining issue is concerned with what Holdings would do if it was using the servitude rights for its own purposes. And the trial evidence was clear on those that it was not doing this. In fact, it was intending to use the servitude for Omega, a lessee. Well, let me ask you a preliminary question, and that is how do we haveó this is a declaratory judgment action, right? Right. And my understanding, although it's a little sketchy in the briefs, is that neither Omega nor Holdings has come up with a dock plan for the servitude, and therefore it's difficult for me to see how we have a concrete case or controversy amenable to 2201. That's a fair question, Judge Jones. Well, you didn't raise it, so that's why I figured there must be an answer. We did raise it, and we raised it as a justiciable issue because of the very fact that you cited. What we had here was Plaquemines Holdings filed a suit seeking an injunction and a declaratory action. The injunction they lost, it was about a retaining pond that was put on the property. They lost and did not appeal that. So we're left with the declaratory judgment of, number one, whether it's a valid agreement. The servitude agreement is valid. Well, we never contested that. The trial judge found that it was valid, and we don't appeal that. So what the trial judge did, however, was say, you know what? The servitude uses, the dock plans that you submitted, Holdings, don't work, not any of them, because they're not in compliance with the servitude agreement, which requires that the dock design itself be in line with the existing ship dock that CHS has adjacent to the river bank. And none of those designs were that. It was admitted at trial that none of them were that. And so the trial judge said, well, then, here's what you can do. Well, take those designs. And in her amended opinion, she wrote about how maybe you could make it fit or not fit. And none of that, all of that was conceptual. We've never seen such a design at CHS. And CHS has the right under the servitude agreement to approve designs, none of which have been submitted. That's why I'm saying, I'm wondering whether we shouldn't vacate and remand with instructions to dismiss this part of the case entirely. You didn't ask for that relief, but it seems to me that jurisdictionally I don't see a case it's not ripe. Well, Judge, I think we asked in a different way. We certainly didn't ask for a vacation, that is true, but we did ask that it be reversed. But you wouldn't object to that? We would not object to that. The fact is that we did raise justiciability. Wouldn't it just prolong the agony if it's not ripe? Prolong what? I'm sorry, Judge. Agony. Well, it could. I mean, the problem is we don't know what the agony is going to be. If it gets ripe, you're going to sit back and do the same thing? Well, no. They'd have to come up with a set of dock plans that is aligned with the other dock and that provides ingress and egress to the barge cover station and give you the right to reasonably refuse, which they never did. Right. And to address your point, Judge Jolly, I was going to say, we don't know what the agony is until we've seen the designs. So we, as CHS, can see that there's a valid servitude agreement that has a specific use in it, and we've never seen designs that hit that, and even the trial judge found that. But the overriding issue that also was decided against CHS errantly, and frankly I was pointing out that this is the linchpin issue of the case, is that what we do know from the trial proceedings is that they plan to use this dock for a third-party lessee that's not authorized to use it under the servitude agreement. This party is called Omega Refining. It was not a litigant. It was admitted at trial, however, and the trial judge found that Omega Refining would be using this. Now, to understand the background, you have to go back to what was the servitude agreement set up for in the first place. It was set up for a landowner adjacent to the grain elevator that was in the ethanol business, that was building an ethanol plant, and that company was called Misalco, and Misalco was building an ethanol plant and unfortunately never got off the ground, and it needed river access to ship out its finished product. The grain elevator was a natural synergistic neighbor. We brought in the grain. They bought some of the grain. They processed it into ethanol, shipped it out via the river, so they were going to need a dock for that. So the servitude agreement itself, which in the recital says that it is a limited servitude, limited rights are granted to Misalco, talks about ethanol, talks about grain-based businesses. But more importantly than that, in Section 15.1, it takes care of what kind of business this is. Section 15.1 is the invitee definition, and it says you, Misalco, and now Holdings, because Holdings is the successor in interest, you have the right to bring invitees onto this property. Those invitees can include lessees. But the limitation is that the invitee must do action only as necessary for Holdings, put Holdings in the place of Misalco, to exercise its servitude rights for its legitimate needs operating the plant, capitalized P. And so its is significant here. We had some briefing on this. Excuse me, Your Honor. Well, but back in the first part of the servitude agreement, it says this applies to Misalco or any lessee, right? It does. Invitee includes the definition of lessee. That is correct. But not any lessee. So what it encompasses and envisions is that a lessee would be brought onto the property to service the ethanol plant. That is not unusual. And so the parties that were convecting this agreement in 1994 provided for that. But the language of that invitee provision specifically says that it's only as necessary for Holdings to exercise its servitude rights for its legitimate needs in operating the plant. So what we learned at trial was that Holdings is not operating the plant and, in fact, has dismantled the plant. Holdings has never been in the ethanol business. It is selling off the property for scrap. Well, you're not trying to invalidate the whole servitude, though. That is correct. We are not and never have taken the position that the servitude itself is invalid. We are taking the position that when it became clear that Omega, and the trial judge found that Omega was going to be the exclusive user of the property, of the servitude, that's a problem. The servitude agreement does not provide for that. So they sought a declaratory action, and ultimately they modified their relief that they sought, and the trial judge said, yes, Omega's fine. And it misinterpreted Section 15.1 in doing that to suggest that this section is meant only to prohibit trespassing on the property. But, you know, in my view, I mean, that arguably was a justiciable controversy, but all the rest of this about plans, it just isn't. Right, Your Honor. I think that's a fair reading of it. In other words, we learned at trial and they sought a declaration that Omega could be the user for whatever they wanted to do with it, and it's totally foreclosed by the language of the agreement, which brings us to the Louisiana law of construction. Which says what? What is it about the agreement that totally excludes this? The definition of invitee. So the servitude agreement says dominant estate holder holdings, you can bring folks from the outside onto our property, onto the servitude estate holder's property, that's CHS, but only as necessary to service your holdings' legitimate needs in operating the plant. The plant is being dismantled. There is no plant. In fact, that's the consistent testimony. So the response, and I want to give fairness to the response and address that now, has been. There were a plant. No. No construction began on it even? Not, well, we understand, and this was Omega, I believe, testimony through holdings representatives, that Omega plans to build an entirely new plant that is not going to be in the ethanol business, but it's going to be in the motor oil refining business. So that's not covered. That's not its plant. That's not its legitimate needs. The word its modifies holdings. But Misalko is defined as the company, its successors and assigns, or any future owners of the Misalko property. So, you know, successors and assigns could include Omega Holdings. Well, I disagree with that, Judge. That does not, I think all of those things are true, but Omega is not a successor in interest. It is a lessee of the successor in interest. And that term is strictly and narrowly defined to mean someone who is servicing and providing services to Misalko's successor. So holdings is Misalko's successor. If holdings was still in the ethanol business and they put a lessee on the property to maintain their equipment or to ferry their barges back and forth or to tow the barges, we wouldn't have an argument. What they've done is leased it wholesale to a brand-new tenant. And the problem with this is if you allow that, then you allow any tenant. You allow them to subdivide the property. You allow them to have 15 different tenants and ship whatever they would like, not just motor oil. And this is— Consent shall not be unreasonably refused. Right. So we get to that. Well, first of all, you don't get to that unless you read its out of that language that I just referred to. In other words, holdings use of its plant. Now, plant carries you to three different definitions. Plants defined as the ethanol plant or some other kind of business. Business is defined as ethanol or grain or something different as long as we consent to it. CHS consents to it. And so you have— As long as you do not unreasonably— Unreasonably not consent. That's correct. And we've not been given that opportunity, never been asked. Second, the issue, though, is is that a confusing derogation? The suggestion in the Appellee's brief was that rendered it ambiguous and we get to freely use the servitude. And that gets me to the rule of construction. Because the rule of construction under Louisiana law, and it's codified in Article 730 of the Civil Code, is that doubt as to the operation of a servitude is resolved in favor of the serving a state. That's CHS. This court in Terrebonne Parish decided and written by Judge Wiener stated that predial servitudes under Louisiana law are necessarily in derogation of public policy and they are restraints on the free use of immovable property. And all ambiguities or doubts must be resolved in favor of the serving a state. So as to limit the use of the servitude. That's exactly the situation that we have here in that if you construe business to include any, any, as the trial judge found, any non-ethanol product, then you could ship benzene from this location right next to where the grain is being loaded and offloaded. That's an unfair construction and obviously not envisioned by the original folks. But you don't have to go to original purpose. Just suppose for the sake of argument that it was Holdings that was going to build the plant here and Holdings wanted to ship refined motor oil or dispose of refined motor oil. What would your response to that be? We would say that's acceptable. There's not a problem with that. We'd have to deal with the dock design. We'd get past this issue. The problem is the operator. I think a lot of this problem is probably soluble by money, but one way or another. Well, Your Honor, so the rule of construction would favor my client, CHS. There's absolutely no question that the jurisprudence and the code and the operative law is very clear on that. Terrebonne Parish sets it out nicely. The remaining issues only get reached if you disregard the invitee issue. And if you rule in favor of Holdings on that issue that they can bring anybody they want onto the property to do whatever they want irrespective of the language of the servitude agreement. Then you get to what gets shipped. And the trial judge found that any nonethanol product can be shipped. That was an overreach and an expansion of the servitude rights in the agreement. Even they stated in their brief at page 33 that they didn't believe that they could do that under the servitude agreement. The next problem with the trial judge's decision is that the judge placed extra contractual restraints on CHS. So you have in the original servitude agreement an agreement between two parties that said, well, if you call upon CHS to assist with core proceedings, for example, because the dock has to be approved by the Corps of Engineers, that CHS must assist. The problem is, and under Louisiana law, those types of personal obligations do not carry with the transfer of the servitude. And the trial judge stated that we, in fact, were not only required to do that, but that we were essentially enjoined from objecting on the basis that this particular servitude use or the dock construction actually interfered with traffic to the elevator. In that regard, the trial judge made manifest error because she found that the traffic to the elevator changed in 1994, or subsequent to 1994, when the barge cover station itself was built. That is incorrect. That's absolutely manifest error. And the trial witnesses all agreed that the traffic direction never changed. It always proceeded in a northward direction from the south end of the elevator and proceeded into the barge unloader. And what was found is that we now must move our barge cover station, the trial judge found, because of this change. Now, significantly, and this will be my last point on this, the trial judge also found that we did not breach the contract, did not breach the servitude agreement when we built the barge cover station. So all of a sudden, we've got to move something that we didn't breach the agreement in building. Okay. Thank you, Mr. Lee. You've saved some time for rebuttal. Mr. Clinch, we'll hear from you. Good afternoon. Myles Clements, appearing on behalf of Taichman's Holdings. I will first address Your Honor's, Judge Jones' question regarding justiciability. To put this into perspective, this dispute really crystallized when Taichman's Holdings submitted an application for a permit to the U.S. Army Corps of Engineers. CHS objected. That killed that process effectively. And the only basis of their objection was that the stock in the servitude area would interfere with their rain elevator operation. They didn't mention the servitude agreement. They just said, we're a neighbor. We're not going to agree to this. We object. It's going to interfere with our operation. The Corps of Engineers does not resolve legal disputes. It does not construe a servitude agreement. Well, but my point is simply that to enter a declaratory judgment, you have to have an actual, live controversy. And maybe I'm thinking, maybe it's justiciability of declaratory judgment. Maybe it's ripeness. But if you don't have, to this day, a plan that you have arguably fulfilled by asking them to consent, number one, and then, number two, having a plan for a dock, then I don't see how you have a basis to go into court and get any enforcement of anything. I'll respond. We submitted a plan. And then you withdrew it. With the permit. And the nature of the response was that any dock in this defined servitude area, in that geographic area, would be objectionable to CHS. When we proceeded to trial, we submitted several designs. One was particularly, I think, good. And we're dealing with the dock. We're not dealing with the construction of anything complicated. Put up a couple of pilings, some cross piles, some iron, and that's the dock. Well, you're going to have an extraordinarily, you're contemplating extraordinarily long tankers, and they would prevent ingress and egress to the barge cover station, as I read the briefs. Well, their concern is access to their barge cover station. Let me get to the point. What this controversy is at its core all about is location. The location of the dock. The district judge found that the dock design we submitted was perfectly acceptable. Which dock design? Give me an exhibit number. Exhibit dock design two. And that design would not obstruct CHS's 24-hour, 7-day-a-week access to the area that it was using at the time the servitude agreement was entered into. Which dock design are you talking about, please? It's option two dock design in exhibit four. The judge found that that's a perfectly acceptable design that they could not reasonably object to, but it needed to be in line with the existing dock, which we felt would probably interfere with our operation more. We were trying to find an accommodation and get some guidance on this. And the judge ruled that we could put up this dock design so long that it was further out into the river in line with CHS's existing ship dock. In line here meaning parallel with? Right. In line with, parallel to, and it's described in the decision. But it would be flush against the outer river edge of the CHS ship dock. Why doesn't that holding, let's move past this ishability then for the sake of argument. Why doesn't that holding squarely conflict with the part of section 15 that says that whatever is done with the servitude has to make reasonable provision for the ongoing grain business? Well, we have actually. 15.3 maybe or 15.1 section three or something? The reason I think, I don't think 15.1 is the section you intended to refer to, but I understand the concept. What we have here is, I think by all accounts, the right to build a dock in this servitude area. The checkerboard that is an attachment to exhibit one. And it's got to be within that area. And whether or not it interferes unreasonably with CHS's operation was what the evidence below was all about. Well, I know, but I guess my point is that even you didn't obtain the benefit of this servitude until nearly a decade after CHS had adopted this barge cover station configuration. So I don't see how you can go back to 1994 and how the court could impose the way they did business in 1994 on a transaction where you didn't take the servitude until years after they had streamlined their business. By definition, the rights under the servitude agreement were assignable and transferable. But that doesn't mean they were frozen in time. Well, the right to build this dock in the defined area was frozen in time. And whatever CHS chose to do outside of that area, we have no control over. But if they did something that the subsequent dock in the servitude area might interfere with, they had to give way on that. And I would refer you specifically to Section 10.7 of the servitude agreement, which predicates CHS's right to use, right to enter the checkerboard servitude area altogether on its accommodation or its noninterference with the servitude dock within that area. And if their operation interferes with the construction of that dock, then they can't go in the area. That's the tiebreaker, we've called it, in the servitude agreement. And I think the servitude agreement, in common sense terms, would seek cooperation among the parties, would seek Plaquemines Holdings to put up the least intrusive dock with regard to CHS's business and for CHS to cooperate in the designation of that location. But they have refused to do so. They have taken the position that we're not saying that there's no place to put it, but we're not going to tell you where that is. 10.3, subsection 1, if Misako builds this, due respect shall be given to minimizing the level of mutual interference between plant and elevator operations, especially the loading and unloading of barges, ships, and rail cars. Compatibility to the extent practicable with elevators, facilities, operations, improvements. Number three, future uses of and improvements to the elevator facilities. I think those compatibility, those are all words that connote cooperation. Well, when you're rendering their barge, their more efficient, I presume, barge cover station unusable for the purpose for which it has existed for nearly 10 years, I think that's not compatible with future uses. Two things. Number one, they can't destroy Plaquemines Holdings as successor and interest to the servitude agreement. It's rights under the servitude agreement simply by constructing something presumably more efficient outside the servitude area. It's in their area, that's for sure. Sure, it's in their area, an area that we have no right to go into. And they also make the point that it's behind your dock area, so what do you care? It's upriver of our dock area. All right. They still have access to that area from the other end of their dock. They just want to come through the servitude area. And they have been doing so for nearly a decade. Yes, but they can't do that to the prejudice of the rights of the holder of the servitude rights under the agreement, number one. And number two, their fate is in their hands. Judge Berrigan ruled that they can waive rights, they can modify rights, they can alter rights in order to designate a location that better suits their purposes. Right now, the judge says the dock must be in line with the existing CHS ship dock. And in the court below, CHS in their briefs took that position, that it must be in line with. Well, we're perfectly happy to put a dock in line with the existing ship dock. And we have, in fact, submitted a permit to do so, which we circulated to CHS before submitting. But if CHS wants to continue to access its ship dock from the south or downriver end, as they have done for many years, then we have a plan, and we submitted it at the trial, that would accommodate that. But they liked the free use of this property without the servitude holder being there for so many years. They just don't want a dock anywhere. And that's what brought us to court. And they continue to resist designating an area that would best accommodate them and accommodate my client as well. So their fate is in their hands. It's not like they can't use their barge cover station if there is a satisfactory location that they'll agree to or even designate. So let me get to some other, or I don't want to prevent you from making your arguments, but do you concede that the only legitimate holding the district court could make here would be if we go beyond the scope of grain-oriented business to ethanol products and that she could not issue an injunction allowing you free reign for any product other than this refined motor oil? What was litigated below was Omega's plan to operate this dock and this property for refined motor oil. And that's it? That's the scope of her, that's the only legitimate scope of her relief? I would agree. We didn't litigate plutonium or benzene or anything else. And this is not simply an interpretation of a servitude agreement. She heard the evidence from all of the witnesses with respect to grain-based product versus oil-based product, and she found, as a matter of fact, that CHS failed to carry its burden, that there was any increased hazard or inconvenience by transmitting oil-based products through this pipeline as opposed to grain-based. And what do you say about the argument that it violates the Constitution for her to rule that CHS must assist holdings in presenting something to the Army Corps of Engineers and may not object? This is not, well, number one, I don't want to dodge the issue, but they did not raise this below. But number two- That's because they say it didn't even show up until her order. Well, the servitude agreement says they must assist. That's not a new issue. That's not a surprise. I think it's qualified. I think it's qualified because, again, you're, you know, A, you don't have a plan, and B, it's a non-grain business. But an assistance is also the argument that it's not a, whatever that Louisiana term is, that it's an accessorial rather than a mandatory. The assistance, to put it into perspective, the assistance that we're talking about is simply don't object. Yeah, well, that's a First Amendment constraint. Ma'am? That is a First Amendment constraint. Well, but it's a constraint that their predecessor and interest imposed on itself when it agreed as a matter of contract to assist. This was never a proposed synergy between a grain operation and an ethanol operation. Back in 1994, a single entity through different, a single, the Feruzzi family through different entities owned all of this property. And they sought, when they divested themselves, they saw a better profit in selling two businesses as opposed to one. The second business was the one my client acquired, and it required river access, a dock. And the only way that ConAgra, who was CHS's immediate predecessor and interest, was able to acquire this property was to agree to this servitude agreement. It's, Mr. Cook testified to that. It's corroborated in the documents. And they did not, did not contract or condition their purchase of the grain elevator upon sales to an ethanol business. Well, why don't you tell me what your best case is that this assistance provision is consistent with Louisiana law about what conditions may be imposed on the, serving a state in a, in a servitude? Well. Let's just tell me your best case. My best case, the basis, the authority. Yes, sir. Yeah. They contracted, ConAgra, their predecessor interest, contracted to assist. I understand that. But in Louisiana laws, I understood it, certain conditions imposed on the landowner in a servitude are not enforceable. In other words, if, if the owner of the dominant estate imposed on the landowner an obligation to take his dogs out and walk, you know, take them out for a walk three times a day, that would not be an enforceable condition under Louisiana law. So it's an assistance. Yeah. The assistance is accessorial. It's incidental or accessorial. So we would rely on comments B to Article 651 and comment B to Article 746 that both explain that there is an exception to the general rule that personal, that praetial servitudes do not require affirmative action by the servant estate holder. The exception is with respect to duties which are necessarily incidental or accessorial to the dominant estate holder's exercise of the servitude. I would also suggest there's a, at least in general terms, a reasonableness requirement. And all we're asking here. What did the judge say? What did the judge say? What did the judge say? What did the judge say? That's your advantage. Yeah. That's her husband. Excuse me. And all we're asking here is not that they spend money, not that they go out and do anything, simply that they don't go to the Corps of Engineers and object or hire someone else to make their objection for them. Because the Corps is not going to decide legal disputes. But in any event, that is the legal authority. And I believe we laid that out in our brief, Your Honor. Well, suppose they didn't like the idea of the refined motor oil because it was an explosive or something. Well, we litigated that, Your Honor. I'm saying would that be within the, would they have the constitutional right to oppose a permit to the Army Corps of Engineers? Well, I'll say this. It would have the contractual right because the servitude agreement provides for other products other than grain-based so long as permission is given, such permission not to be unreasonably withheld. And so that's the contractual dispute that Judge Berrigan heard and resolved and on which CHS did not carry their burden of proof. How do you square the district court's findings that the servitude dock, that the grain cover station did not violate the servitude agreement, but that they were unreasonably interfering with the servitude by having it there? I think the judge was right. Again, whatever CHS does or anyone else does outside of the servitude area, the defined servitude area, is their business. But when it interferes with the exercise of the dominant state's rights under that servitude agreement, then CHS is in breach. So it was when this permit was applied for and- So basically you're saying that's a geographical finding. I'm saying that there was no real impediment when they built their barge cover station after they entered into the servitude agreement, but that it was only when the servitude dock was to be constructed that it became a problem. And it is a problem which CHS had to live with and has to live with going forward. That's why this situation calls out for them to agree to something that will be a win-win, satisfy both sides. We haven't been able to obtain that level of cooperation. Let me also point out real quick that there was a mutual agreement when my client first acquired this property that CHS signed off on, acknowledging that the servitude was still in effect. Well, I don't think they just, you know, they don't contest that. Well, I know, but, you know, it hadn't prescribed, it had not lapsed for non-use. Okay, Mr. Clements, we surely appreciate your argument. And we will turn now to Mr. Lee for rebuttal. Thank you, Your Honor. Thank you, Your Honor. The last point that the re-ratification of the servitude agreement is indeed a non-issue. We've got several rulings from the trial court. We haven't appealed them all, of course. We did not appeal and don't contest that the servitude agreement itself is valid. The issue is the manner and exercise of the servitude agreement. In other words, number one, how is it that Omega Holding is entitled to be the exclusive user of the servitude agreement? That is a very important issue that we will never concede. It is not obligated, it is not imposed upon us as an obligation to accept a third-party lessee that has nothing to do with Holdings' operation of the property. Holdings is an appropriately named company. It is a holder. That's it. It does not operate anything. But the servitude agreement, by its very language, says that it is for the operation of the plant by Holdings. That's the synergy that was originally envisioned. And you don't have to get to the purposes and the suggestion by Mr. Clements that there was a witness at trial, Mr. Cook, who wasn't one of the signatories, he doesn't represent one of the companies, and speculated on what the original purpose of the agreement was. You don't have to get to that because the rule of construction is different from the rule of construction of every other obligation under Louisiana law, and it is that any doubt must, must be resolved in favor of the serving estate holder because pre-deal servitudes are in derogation of public policy and inhibit the free use of immovable property. Judge Wiener got it right in Terrebonne Parish. It's a mere interpretation of Article 730 of the Civil Code. And the comments to that article I commend to your reading because those are even stronger. Servitudes are restraints on the free disposal and use of property and are not on that account entitled to be viewed with favor by the law. So to suggest, as my opponent has, that it's CHS's lack of cooperation that has gotten us here. We are obligated to allow their third-party users who's going to use it for whatever purpose to come on this property and begin using it for that purpose. Did Holdings ever ask you if you would consent to Omega? Never. If they did ask you, is there any remote possibility that you would say anything other than a resounding no? With regard to that issue, it would probably be a no. It's not in the record, but certainly to expand the servitude, which already inhibits our use of our property, is likely not in the cards. So the point about the imposition of personal obligations, for example, and whether they are accessorial or incidental or not, Mr. Clements pointed to comment B to Article 651 as his authority for the suggestion that we took on an imposition and a restraint on our own constitutional rights to object before the court. So we're being restrained under the First Amendment and also under the Due Process Clauses from becoming involved in what could become a litigation proceeding because the lower court judge said that we cannot utter a peep about an as-yet-to-be-seen set of designs that might interfere with our use of the barge cover station. And, of course, there is authority on that, but it goes the other way. The Sharp v. St. Tammany Parish case that we cited stated there is no affirmative burden on the serving estate holder to maintain the servitude. It described accessorial rights as garbage collection, keeping it clean, not don't write a letter or do write a letter, which is what is suggested by the lower court judge that we are restrained from doing. Now, this issue of what we've done in the interim between the execution of this servitude agreement in 1994 and today to somehow limit their servitude rights needs to be resolved because this is the one error that Judge Berrigan made factually that is so against the great weight of the evidence that it cannot be upheld, and that is that the traffic to the elevator proceeded in a different direction before we built the barge cover station. That absolutely was not true. We had evidence and testimony from Holdings Representative Mr. Stewart to the specific effect that the CHS has always traversed and used the same location for unloading its grain. All that happened was that CHS constructed a cover station, a building that protected the grain from the elements and provided another lane of access for more frequent offloading of barges. And as Judge Jones pointed out, we have a better efficiency of use. That happens in this business. You have to increase your efficiency to stay up with this business. And so that's all that was done. That manifest error is what led her to say you can't speak when the court comes calling because you can't object to something that she found was not in breach of the servitude agreement in the first place.